UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:13-CR-63-H-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM IN SUPPORT OF |
| | ) | DEFENDANT'S PRO SE MOTION |
| REYES SANCHEZ JR., | ) | FOR COMPASSIONATE RELEASE |
| | ) | |
| Defendant. | ) | |

Mr. Reyes Sanchez Jr., through undersigned counsel, respectfully moves this Honorable Court to grant his Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" presented by his immediate vulnerability to death or serious complications from COVID-19 due to his spinal and neurological issues, respiratory complications from asbestos exposure, continuously medicated hypertension, prediabetes, and obesity. For hypertension *see* **Exhibit A** (Medical Records) at 16, 34, (ultimately prescribed doxazosin, blood pressure medication, in 2019); for obesity see **Exhibit A** at 40 (BMI in September 2020 of 33, falling within obesity range as defined by the CDC); for prediabetes see **Exhibit A** at 51, 66 (hemoglobin levels of 5.6 and 5.7); for spinal and neurological issues, complications cited throughout **Exhibit A;** for asbestos exposure, *see* **Exhibit B** Letter to Clerk (Mr. Reyes states he spent three years dealing with hazardous waste around ground zero for the 9/11 attacks, that nineteen (19) of his twenty-four (24) fellow workers have died from pulmonary complications, and that the remaining six (6) including himself have ongoing deleterious effects). As verified herein and also

1

attached to said Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), Mr. Sanchez has properly exhausted his administrative remedies by filing his release request with the warden which was denied on August, 17, 2020. *See* **Exhibit C**: Denial Letter from Warden R. Hudgins.

Mr. Sanchez is fifty-nine (59) years old and suffers from a range of neurological issues following a car accident in 2007 which led to multiple surgical procedures to his spine, including nerve pain, degenerative disc changes, loss of intervertebral disc height, and chronic neuropathy reports. *See* **Exhibit A** at 20, 24-25, 27, 32-33, 53; *see also* **Exhibit B** Letter to Clerk's office. Mr. Sanchez also has a history of hypertension, elevated liver function, and pulmonary complications due to being exposed to asbestos for a period of three years while being employed as a rescue worker and a Local Union #78 member at Ground Zero, following the terrorist attacks of September 11, 2001. *See* **Exhibit B** Letter to Clerk. Particularly given that some of the symptoms of long-term asbestos exposure mirror the symptoms of COVID-19 infection, Mr. Sanchez is at a much higher risk for severe respiratory complications due to COVID-19. In a study published in February of this year by the Respiratory Research journal, the researchers found that "[i]n fully adjusted models, patients with preexisting respiratory diseases had significantly higher mortality… higher race of ICU admission… and increased need for mechanical ventilation." *See* Pre-Existing Respiratory Diseases and Clinical Outcomes in COVID-19: a multihospital cohort study on predominantly African American Population (last accessed March 16, 2021) ( *https://respiratory-research.biomedcentral.com/articles/10.1186/s12931-021-*

2

*01647-6)* (importantly, "during the study important confounders such as… race… were accounted for"); *see also* Mayo Clinic: Asbetosis: (https://www.mayoclinic.org/diseases-conditions/asbestosis/symptoms-causes/syc-20354637) (last accessed March 16, 2021).

Mr. Sanchez was ultimately prescribed doxazosin, a blood pressure medication, in 2019 to treat his hypertension. According to the Institute for Respiratory Health, "by far and away, the most common illnesses linked to the development of serious disease in COVID-19 patients across [Great Britain, China, and the USA] have been diabetes, high blood pressure, and obesity. *See* COVID-19 and People with Pre-Existing Lung Conditions: (https://www.resphealth.org.au/coronavirus/covid-19-and-people-with-pre-existing-lung-conditions/) (last accessed March 16, 2021). Moreover, in December of 2020, a new study published in the journal *Neurology: Clinic* Practice, showed that COVID-19 patients can experience a wide range of complications, including strokes, seizures, movement disorders, and cognitive impairment. *See https://cp.neurology.org/content/early/2020/12/03/CPJ.0000000000001031* (last accessed March 16, 2021).

Because of Mr. Sanchez's physical limitations following his car accident and exposure to asbestos, Sanchez also suffers from obesity and prediabetes. *See* **Exhibit B** Letter to Clerk. As of September 24, 2020, Mr. Sanchez had a Body Mass Index of 33, placing him in the obese category as defined by the CDC. *See* CDC: Defining Adult Overweight and Obesity: https://www.cdc.gov/obesity/adult/defining.html (last accessed March 15, 2021). Mr.

3

Sanchez also had hemoglobin levels of 5.7 and 5.6 in his labs taken in November 2019 and March 2020. *See* **Exhibit A** at 51, 66. He is therefore hovering around the range the CDC provides for prediabetes. *See* CDC: All About Your [Hemoglobin] A1C Test ("A normal A1C level is below 5.7%, a level of 5.7% to 6.4% indicates prediabetes.) https://www.cdc.gov/diabetes/managing/managing-blood-sugar/a1c.html (last accessed March 15, 2021).

Again, the Institute for Respiratory Health has noted high blood pressure, obesity, and diabetes as "far and away the most common illnesses linked to severe disease in COVID-19 patients." COVID-19 and People with Pre-Existing Lung Conditions: https://www.resphealth.org.au/coronavirus/covid-19-and-people-with-pre-existing-lung-conditions/. Additionally, the CDC has said adults of any age with obesity or prediabetes are at increased risk of severe illness from COVID-19; Mr. Sanchez has both. *See* CDC Guidance: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Dec. 7, 2020). Ultimately, while detained and unable to comply with reasonable social distancing and hygienic COVID-19 precautions recommended by the CDC, Mr. Sanchez risks the most hazardous COVID-19 complications or death with his combination of pre-existing neurological and respiratory conditions, obesity, hypertension, and prediabetes.

Mr. Sanchez is in custody at FCI Gilmer where the detained population is 1,439 total inmates, with 1,400 at the FCI and 39 at the Camp, according to the Federal Bureau of Prisons. https://www.bop.gov/locations/institutions/gil/ (last accessed

March 16, 2021). Staff members and inmates have already been infected with COVID-19 at FCI Gilmer. There, a total of 306 inmates have tested positive for COVID-19, and on or about February 3, 2021, an inmate at FCI Gilmer died from COVID-19. *See* https://www.wdtv.com/2021/02/04/wva-federal-prison-inmate-dies-of-covid-19/ (last accessed March 16, 2021). At this time, only 113 out of 1,439 inmates at FCI Gilmer have been vaccinated. *See* https://www.bop.gov/coronavirus/ (last accessed March 16, 2021). These are very alarming statistics and Mr. Sanchez continues at being at high risk of contracting COVID-19. If that occurs, the coronavirus will likely significantly impact his life by attacking, *inter alia*, his central nervous system, respiratory system, or even cause his death. This type of punishment which consists of him having to be detained during these times does not fit the crime anymore; in other words, it is certainly greater than necessary. 18 USC § 3553(a).

According to a National Commission on COVID-19 and Criminal Justice report released in September of 2020 on the impact of COVID-19 in U.S. State and Federal Prisons, the COVID-19 mortality rate within prisons is twice as high as the general population's morality rate and the rate of COVID-19 infections is over four times as high as the general population. *See Schnepel, Kevin T.* COVID-19 in U.S. State and Federal Prisons. Washington, D.C.: Council on Criminal Justice (September 2020). This is particularly concerning when the United States has the largest incarcerated population in the world at about two million detainees. A key finding from the report was that the highest COVID-19 mortality rates were observed "within large prisons…" *Id.* Mr. Sanchez is detained at FCI Gilmer, which is a large prison already

having to provide extensive medical care to many inmates with COVID-19. Therefore, considering all the dire factors in this case, he is most certainly at a high risk of COVID-19 complications or mortality, which demonstrate extraordinary and compelling reasons for compassionate release.

As most judges from the Eastern District of North Carolina have granted such Compassionate Release Requests where it is appropriate to show this type of legally-sanctioned mercy, it is respectfully requested that this Honorable Court also issue an order reducing Mr. Sanchez's sentence to time served and/or home confinement given that it is appropriate to do so in Mr. Sanchez's case. See for example, *United States v. Roberto Pablo Gutierrez*, Crim. No. 5:11-CR-149-1-BR, ECF No. 156 (E.D.N.C. April 30, 2020).

## STATEMENT OF FACTS

On March 12, 2013, Reyes Sanchez Jr. was named in a five-count indictment filed in the Eastern District of North Carolina in front the Honorable Senior U.S. District Court Judge Malcom J. Howard. [D.E. 18]. Count one charged Mr. Sanchez with conspiracy to distribute and possess with intent to distribute more than one (1) kilogram of heroin in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841 (b)(1)(A). [D.E. 18, pp. 1-2]. Counts two through five charged Mr. Sanchez with distribution of a quantity of heroin and distribution of a quantity of heroin: aiding and abetting. [D.E. 18, p. 2]. On February 2, 2014, Mr. Sanchez plead guilty to count one and the government dismissed counts two to five pursuant to a plea agreement. [D.E. 85]. On

6

June 10, 2014, a judgment was entered against Mr. Sanchez, sentencing him to 120 months of imprisonment and five years of supervised release. [D.E. 102]. Mr. Sanchez's projected release date is August 3, 2021 (https://www.bop.gov/inmateloc/).

The current COVID-19 outbreak has not yet been contained in the United States and certainly and sadly not within our prison walls either. Thus, it is respectfully submitted that this Honorable Court find that Mr. Sanchez has satisfactorily pursued his administrative remedies given that all matters have been completed, as required by 18 U.S.C. § 3582(c)(1)(A). Accordingly, it is respectfully submitted that it is appropriate under these urgent circumstances for this Honorable Court not to strictly construe the administrative exhaustion requirement in the case sub judice and as such, find that Mr. Sanchez has in fact exhausted his administrative remedies. *See Haines v. Kerner*, 404 U.S 519, 520 (1972).

## BACKGROUND

Congress first enacted 18 U.S.C. § 3582(c)(1) as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" for judges to assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983). "This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when 'extraordinary and compelling reasons' indicate that the sentence initially imposed on an individual no

longer served legislative objectives." *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at * 5 (S.D.N.Y. Apr. 6, 2020).

The compassionate release statute empowered courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Congress delegated to the U.S. Sentencing Commission the responsibility of defining what were "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). It was not until 2007, more than two decades after the statute was enacted, that the Commission responded. It issued a guideline stating that "extraordinary and compelling reasons" include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n.1(A)-(D).

As discussed above, Mr. Sanchez is unfortunately extremely vulnerable to hospitalization wherein his life as he knows it can very easily be detrimentally impacted forever or, worse, he could potentially be facing death if he does contract COVID-19. *See* Current CDC Determinations of High Risk Conditions: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed February 19, 2021); *see also supra* **§Background** at 2-6. . Due to the combination of risk factors, proven through statistics and medical reports, Mr. Sanchez's request for compassionate release qualifies under the guidelines as 'extraordinary and compelling' reasons. Application

8

Note 1(A)(ii) to Guidelines Section 1B1.13 states extraordinary and compelling reasons, which include when the defendant is—

(I)     suffering from a serious physical or medical condition;
(II)    suffering from a serious functional or cognitive impairment; or
(III)   experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 app. n. 1(A)(ii). Application Note 1(B) identifies extraordinary and compelling reasons to include Mr. Sanchez's "suffering from a serious physical or medical condition." Furthermore, Application Note 1(D) created a catch-all provision, for when the Director of the BOP determined "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."

As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the BOP, who adopted a program statement governing compassionate release that in many ways narrowed the criteria established by the Commission. *See* BOP Program Statement 5050.49. During the span of more than three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria. The Office of the Inspector General for the Department of Justice concluded in 2013 that "[t]he BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*

(April 2013), at 11, available at https://oig.justice.gov/reports/2013/e1306.pdf; *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015), at 51, available at https://oig.justice.gov/_reports/2015/e1505.pdf ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population...", decades of denying such Compassionate Release Reduction Requests are imprinted in its long standing history); U.S.S.G. § 1B1.13, app. n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates). Heeding this criticism, Congress acted.

The title of Section 603(b) of the First Step Act—"Increasing the Use and Transparency of Compassionate Release"—leaves no doubt as to Congress' intent in modifying 18 U.S.C. § 3582(c)(1)(A). Through the First Step Act, enacted December 21, 2018, Congress sought to resuscitate compassionate release by, *inter alia*, allowing defendants to directly petition courts for relief, rather than leaving that power solely in the hands of the BOP. *See* 18 U.S.C. § 3582(c)(1)(A). "[U]nder the amended statute, a court may conduct such a review also 'upon motion of the defendant,' if the defendant has exhausted all administrative remedies to appeal the BOP's failure to bring a motion, or if 30 days has lapsed 'from the receipt of such a request by the warden of the defendant's facility,' whichever is earlier." *United States v. Decator*, No. CCB-95-0202, 2020 WL 1676219 (D. Md. Apr. 6, 2020) (*quoting* 18 U.S.C. § 3582(c)(1)(A)(i); Pub. L. 115-391, Title VI, § 603(b), Dec. 21, 2018, 132 Stat.

5239), *appealed by the government*. In other words, "a prisoner must exhaust the administrative appeal process, or wait 30 days, before his claim may be considered" by the court. *United States v. Underwood*, No. TDC-18-0201, 2020 WL 1820092, at *2 (D. Md. Apr. 10, 2020) (citing cases).

## ARGUMENT

Mr. Sanchez's underlying medical conditions make him especially vulnerable to COVID-19, constituting "extraordinary and compelling reasons" for relief. His release does not pose a danger to the community, and a balancing of the § 3553(a) factors with the risks to Mr. Sanchez posed by COVID-19 warrants relief.

### A. This Honorable Court has the authority to determine that Mr. Sanchez's vulnerability to COVID-19 does in fact constitute an "Extraordinary and Compelling Reason" for a sentence reduction.

Many federal judges across the country are holding that they have the authority to define "extraordinary and compelling reasons" for release under § 1B1.13 app. n. 1(D) and that the risks associated with COVID-19 can constitute an "extraordinary and compelling reason" for a sentence reduction. *United States v. Brooker (Zullo)*, No. 19-3218, 2020 WL 5739712 (2d Cir. Sept. 25, 2020). Courts have used their wise and appropriate discretion to provide defendants with relief under § 3582(c)(1)(A) "even when their circumstances do not fit squarely within the current policy statement of the Sentencing Commission as reflected in U.S.S.G. §1B1.13." *United States v. Alexander Salabrarria*, Crim. No. 7:00-CR-95-1-BO, ECF No. 125, page 5 (E.D.N.C. April 14, 2020), citing *United States v. Mauma*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *4 (D. Utah Feb. 18, 2020) (listing cases holding same).

11

In *United States v. Mel*, Judge Chuang held that "[a]s applied to Mel, the COVID-19 pandemic presents 'extraordinary and compelling reasons' that warrant the modest sentencing reduction requested." 2020 WL 2041674, at *2. Ms. Mel had submitted documents establishing that she had a thyroid mass that doctors estimated had a 25- to 40-percent chance of malignancy. While Judge Chuang found he could not "conclude with certainty" that Mel had a health condition that placed her at particular risk to severe illness from COVID-19, he "nevertheless . . . f[ound] that the historic COVID-19 pandemic, the fact that Mel has been incarcerated in one of the federal prisons most profoundly impacted by COVID-19 [FCI Danbury], and the fact that as a result of the outbreak, she has effectively been prevented from receiving necessary medical care for a potentially life threatening condition, collectively establish 'extraordinary and compelling reasons' within the meaning of 18 U.S.C. § 3852(c)(1)(A)." *Id.* at 3. As discussed herein, the case sub judice presents similar factors with respect to Mr. Sanchez who is currently being incarcerated at FCI Gilmer, where there was just recently a COVID-19 related death, and about 23% of the inmate population has tested positive for COVID-19. Such an environment places Mr. Sanchez at high risk given his medical ailments. Consequently, much like Ms. Mel, Mr. Sanchez presents a series of factors which 'collectively establish 'extraordinary and compelling reasons' within the meaning of 18 U.S.C. § 3852(c)(1)(A)." ' *Id.* at 3.

Judges in districts throughout the United States have recognized that for certain defendants COVID-19 presents "extraordinary and compelling reasons"

warranting a reduction in their sentences under the compassionate release statute. They vary from individual to individual, which is to be expected, but a common thread attaches them all; that is, the need to otherwise have a fighting chance at surviving alongside their loved ones, as opposed to physically suffering and unnecessarily deteriorating once the coronavirus is contracted by an inmate because of his or her unfortunate medical diseases and concerns or simply due to the fact that COVID-19 is running rampant across our federal prison system leading to unnecessary suffering and death amongst the inmates therein. Some of these cases are cited below to identify the range of which Federal Courts across the country are granting such Compassionate Release Requests. These cases include, but are not limited to:

- *United States v. Howard*, No. 4:15-cr-00018-BR, 2020 WL 2200855 (E.D.N.C. May 6, 2020) (finding 52-year-old with "chronic obstructive pulmonary disease ('COPD'), Type II diabetes, obesity, Stage 3 kidney disease, edema, open wounds on his legs, and a diaphragmatic hernia" demonstrated extraordinary and compelling circumstances due to COVID-19 even though his conditions neither constituted terminal illness nor prevented him from engaging in most of his daily activities without assistance);

- *United States v. Norris*, No. 7:19-cr-36-BO-2, 2020 WL 2110640 (E.D.N.C. Apr. 30, 2020) (finding defendant had demonstrated extraordinary and compelling circumstances for relief because he "suffers from various severe ailments," including a life-threatening disease, kidney failure requiring dialysis three times a week, and recurrent bouts of pneumonia, "that cumulatively make his continued confinement especially dangerous in light of COVID-19.")

- *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (shortening 60-month sentence after only 21 months because Amarrah's "Type II diabetes, hypertensive heart disease, cardiac arrhythmia, obstructive sleep apnea, and asthma" put him a substantial risk should he contract COVID-19 even though facility had no reported cases);

- *Casey v. United States*, No. 4:18-cr-4, 2020 WL 2297184, at *3 (E.D. Va. May 6, 2020)("The Court finds that Petitioner has set forth extraordinary and

13

compelling reasons to modify his sentence because of the great risk that COVID-19 poses to a person of his age with underlying health conditions.");

- *United States v. Quintero*, No. 08-cr-6007L, 2020 WL 2175171 (W.D.N.Y. May 6, 2020) (granting compassionate release to man who "suffers from diabetes, a compromised immune system, obesity, and hypertension," "which make him more susceptible than another to contract the virus.");

- *United States v. Early*, No. 09 CR 282, 2020 WL 2112371, at *2 (N.D. Ill. May 4, 2020) ("the Court cannot discount the risk to Mr. Early if he contracts coronavirus, as reliable information places him in a higher-risk category [62, diabetes and hypertension]. This, in the Court's view, qualifies as an extraordinary reason warranting consideration of a reduction of Mr. Early's sentence.");

- *United States v. Soto*, No. 1:18-cr-10086-IT, 2020 WL 2104787 (D. Mass. May 1, 2020) (finding inmate with hypertension at facility with COVID-19 cases located in New York had shown extraordinary and compelling reasons for relief);

- *United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241, at *7 (S.D. Miss. May 1, 2020) (granting compassionate release to young man without health issues at Oakdale I because "it has become increasingly apparent that the BOP has failed to control the outbreak at Oakdale I. … Given the steadily growing death toll and the apparent continued spread of the disease at Oakdale I, COVID-19 creates an 'extraordinary and compelling reason' potentially warranting a reduced sentence.");

- *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 10, 2020) ("Mr. Rodriguez's circumstances—particularly the outbreak of COVID-19 and his underlying medical conditions that place him at a high risk should he contract the disease—present 'extraordinary and compelling reasons' to reduce his sentence."); and

There is no question that Section 603(b) of the First Step Act fundamentally changed the role of courts in the compassionate release process, vesting them with the authority to determine what constitutes extraordinary and compelling reasons for release. This frightening pandemic, as applied to Mr. Sanchez with his multiple

14

medical conditions and high risk of worsened respiratory complications, or death, if

he contracts COVID-19, is an extraordinary and compelling circumstance.

**B. Mr. Sanchez's Dire Situation Presents an "Extraordinary and Compelling" Reason Warranting a Reduction in Sentence.**

The Centers for Disease Control have identified several factors that put

individuals at higher risk for severe illness. "People of any age

with certain underlying medical conditions are at increased risk for severe illness

from COVID-19." CDC, *People with Certain Medical Conditions.*

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-

medical-conditions.html (last accessed February 19, 2021) (listing hypertension and

neurological conditions as medical conditions that might increase the risk of severe

illness from COVID-19); *see also* Institute for Respiratory Health.

https://www.resphealth.org.au/coronavirus/covid-19-and-people-with-pre-existing-

lung-conditions/ (listing diabetes, high blood pressure, and obesity as far and away

the most common illnesses linked to the development of serious disease in COVID-19

patients (last accessed March 16, 2021).

While the Bureau of Prisons has made efforts to reduce the spread of the virus

throughout the federal prison system, the rate of infection is far higher within the

Bureau of Prisons than within the community at large, and continues to spread at an

alarming rate. Accordingly, amid this rapidly-unfolding crisis, the recommended

antidote is simple: reduce the prison population by releasing those whose continued

incarceration is not necessary to protect the public so that correctional institutions

15

can better protect those who need to stay incarcerated.[1]  Mr. Sanchez is exactly the type of individual deserving of compassionate release: he may be at risk of severe illness and, as will be discussed in the next section, his release does not pose a danger to the community and balancing the 3553(a) factors warrants the requested relief.

## C. The Relevant § 3553(a) Sentencing Factors Warrant Reducing Mr. Sanchez's Sentence to Time Served / Adding a Period of Home Confinement as a Condition of Supervised Release.

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, Mr. Sanchez's compromised physical health combined with the Section 3553(a) sentencing factors, warrant immediate relief.

The court shall impose a sentence that is sufficient but "not greater than necessary" to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical

---

[1]  For example, on March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly and medically vulnerable inmates who have already served a majority of their sentence. *See https://fairandjustprosecution.org/wp-content/uploads/2020/03/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf.*  The same day, dozens of public health experts made a similar request, asking the President to commute the sentences of elderly inmates, noting they are at the highest risk of dying from the disease and pose the smallest risks to public safety. *See https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf.*

care, or other correctional treatment in the most effective manner. § 3553(a)(2)(A)-(D). "[A]lthough defendant's federal sentence may have been appropriate at the time it was imposed, the Court's analysis is different in current circumstances. *United States v. Lee*, 2020 WL 3422772, at *5 (E.D. Va. June 22, 2020). *United States v. Mel*, 2020 WL 2041674 at *3 (D. Md. Apr. 28, 2020) (finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.").

Any further incarceration of Mr. Sanchez during this time would be to continue a sentence that is greater than necessary, particularly when "prisons now are even more dangerous than we typically accept." *United States v. Brown,* No. 4:05-CR-00227-1, 2020 WL 2091802, at *2 (S.D. Iowa Apr. 29, 2020). Mr. Sanchez has served almost all of his 120 month sentence, which reflects the seriousness of the offense. In fact, his release date is projected to be August 3, 2021(https://www.bop.gov/inmateloc/). It is also worth noting that he is serving a sentence for a non-violent offense.

Further deterring any future criminal conduct, Mr. Sanchez has a clear release plan and will be residing with Ms. Beverly Williams. *See* **Exhibit C** (Character Letter: Letter from Ms. Williams) Ms. Williams resides in New York with her autistic son, whom Mr. Sanchez knows very well. Ms. Williams has known Mr. Sanchez for nearly 30 years and acknowledges that he will be of great help with her son.

Mr. Sanchez is also a loving grandfather who has always played a great role in his family's lives. *See* **Exhibit D** (Character Letters: Letters from Brinnon Eaves and

Jourdain Sanchez) Mr. Sanchez has a great support system in place and family members willing to help him once he is released. Mr. Sanchez's father is particularly hopeful to see Mr. Sanchez soon, as he is over 80 years old and was recently diagnosed with stage 4 cancer. *See* **Exhibit D** (Character Letters: Letter from Reyes Sanchez Sr.).

Mr. Sanchez had been an active member of the community before his incarceration. *See* **Exhibit D** (Character Letters: Letter by CEO/Founder of Redirection Center About Progress, Inc. Floyd Youmans). Mr. Youmans has known Mr. Sanchez for over 40 years. He vouches for Mr. Sanchez's ability to maintain gainful employment, and has known Mr. Sanchez to provide assistance to families through volunteer work. Mr. Youmans also vouches for Mr. Sanchez's strong support system, family and friends alike, who will gladly provide him with the help he needs once he is released. *See* **Exhibit D**.

Mr. Sanchez also intends to pursue a higher level of education upon his release. On August 24, 2020, Mr. Sanchez received a letter from the Office of the U.S. Department of Education stating that he may be eligible for a Federal Pell Grant up to $6345. *See* **Exhibit E**. This grant may be available to Mr. Sanchez once he is released on supervision, but may not be available to him while incarcerated at a Federal institution. Thus, Mr. Sanchez is taking positive steps in preparing for his release, including assuring he has the means to continue and complete his college education.

Although at the time of his sentence Mr. Sanchez had pending charges for Criminal Possession of a Controlled Substance – 7th Degree and Operating a Vehicle Without Stop Lights (2012QC032894 and 2014QN067693) in Queens County, New York, those charges were dismissed on October 2, 2020. *See* **Exhibit F** (Queens County Dismissals**).** With no pending criminal charges against him, Mr. Sanchez can look forward to rebuilding his life with the help of his family and friends.

Furthermore, to provide Mr. Sanchez most effectively with medical care, he should be allowed to seek medical care outside of the BOP. Since Mr. Sanchez has been detained, his health has declined dramatically. At the time of his sentencing, the Court recommended that Mr. Sanchez be evaluated for all existing medical issues, specifically his spinal issues, as soon as possible. *See* **Exhibit G** (Judgment Order, at 2). However, aside from meeting with a few specialists over the years, Mr. Sanchez has not been given the proper care or treatment needed to alleviate his symptoms. In fact, his spinal problems have worsened over the years. *See* **Exhibit A** (Medical Records) at 52, 66 (showing increase in medications from 2014 to 2019), and at 7, 39 (showing greatly worsened symptoms from spinal injuries from 2014 to 2020).

A reduction or modification of Mr. Sanchez's sentence would not diminish the seriousness of the offense, nor would it place the public in any danger, especially considering the fact that his release date is projected to be August 3, 2021 (https://www.bop.gov/inmateloc/). The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—compounded by the heightened risks faced by Mr. Sanchez, whose ability to engage in basic self-protective measures

19

is restricted and, warrant relief. Mr. Sanchez's period of supervised release awaiting him will ensure that he complies with the release plan discussed with his family. *See United States v. Early*, 2020 WL 2112371, at *5 (N.D. Ill. May 4, 2020) (finding that the risk to the public "does not outweigh the risk to [Early] from contracting the coronavirus while incarcerated," particularly where "the Probation Office and the Court will be monitoring him while on supervised release and []the Court will not hesitate to recommit him to prison should he again go astray.") The Court may also impose home confinement for a term equivalent to the remainder of his custodial sentence as well. 18 U.S.C § 3582(C)(1)(A). *See also United States v. Raia*, No. 2:18-CR-657, Dkt. No. 91 (D.N.J., May 7, 2020). In fact, as stated in Mr. Sanchez's Motion for Compassionate Release, his "Home confinement date" was scheduled for February 3, 2021. Considering all of these emergency circumstances, this Court should find that a combination of supervised release and/or home confinement is sufficient to ensure deterrence, protection of the public, and would allow Mr. Sanchez to seek alternative medical care in a place that is sanitary and conducive to the recovery of his deteriorating health since his incarceration.

## CONCLUSION

It is respectfully submitted that Mr. Sanchez has demonstrated extraordinary and compelling reasons for compassionate release and thus, respectfully requests this

Honorable Court to reduce his sentence to time served and/or add a period of home confinement as a condition of supervised release.

Respectfully submitted, this the 20th day of March 2021.

GUIRGUIS LAW, PA

/s/ Nardine Mary Guirguis
Nardine Mary Guirguis
434 Fayetteville St., Suite 2140
Raleigh, North Carolina 27601
Telephone: (919) 832-0500
Facsimile: (919) 246-9500
nardine@guirguislaw.com

*Designation: CJA Appointed*

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the Assistant Attorney for the United States electronically at the following address:

Joshua Royster
Assistant United States Attorney

21

Eastern District of North Carolina
150 Fayetteville St.
Suite 2100
Raleigh, NC 27601
Joshua.royster@usdoj.gov


This 20th day of March2021.


GUIRGUIS LAW, PA

/s/ Nardine Mary Guirguis
Nardine Mary Guirguis
PANEL Attorney